UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

JOHN LEWIS,
  a/k/a "JL,"

                Defendant.

**S1 21 Cr. 391 (LTS)**

## THE GOVERNMENT'S SENTENCING SUBMISSION

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Emily A. Johnson
David J. Robles
Benjamin Woodside Schrier
Assistant United States Attorneys
    *Of Counsel*

## INTRODUCTION

The Government respectfully submits this letter in advance of the sentencing hearing for John Lewis, the defendant in the above-captioned case, which is currently scheduled to take place on January 13, 2022, at 2:00 p.m.  For the reasons set forth below, the Government respectfully requests that the Court impose a sentence that is below the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") range of 70 to 87 months' imprisonment, but which is at least 48 months' imprisonment.  In the final Presentence Investigation Report (the "PSR"), the United States Probation Office ("Probation") recommends a sentence of 70 months' imprisonment.

### I.   Background

#### a.  Offense Conduct

Since at least in or about December 2019, law enforcement has been investigating a group of individuals, including the defendant and his co-defendants Tara Lipsky and Kevin Turner, who worked together to distribute large quantities of methamphetamine and other narcotics in and around New York City and Suffolk County, New York.  *See* PSR ¶ 12.

In connection with the foregoing investigation, in or about the summer of 2020, an undercover law enforcement officer ("UC-1") was introduced to the defendant.  *See id.* ¶ 13.  UC-1 posed as an individual interested in buying large quantities of methamphetamine from the defendant and thereafter distributing that methamphetamine to other individuals.  *See id.*

Between on or about July 22, 2020, and November 17, 2020, in or around Suffolk County, on at least approximately 15 separate occasions, the defendant sold UC-1 various quantities of methamphetamine.  *See id.* ¶ 16.  The foregoing transactions were recorded by covert audio and video recording devices worn by UC-1.  During at least approximately three of the foregoing transactions, the defendant was accompanied by Lipsky, who assisted with or otherwise facilitated

the transaction.  *See id.*  In total, the defendant sold UC-1 approximately 700 grams of methamphetamine.  *See id.*

On or about November 13, 2020, the defendant and UC-1 participated in a phone call.  *See id.* ¶ 18.  During that call, UC-1 stated that certain methamphetamine customers of UC-1 (the "Manhattan Customers"), to whom UC-1 had previously distributed methamphetamine that UC-1 had bought from the defendant, had relocated from Long Island to Manhattan for the winter.  *See id.*  UC-1 asked the defendant if he would be willing to travel to Manhattan in the near future for the purpose of selling methamphetamine to UC-1, which UC-1 could then distribute to the Manhattan Customers.  *See id.*  The defendant agreed to do so.  *See id.*  The foregoing phone call was recorded.

On or about November 17, 2020, the defendant and UC-1 participated in another recorded phone call.  *See id.* ¶ 19.  During the call, UC-1 stated that UC-1 was located in Manhattan.  In fact, UC-1 was located in or around the Bronx.  *See id.*  UC-1 asked the defendant if he would be willing to travel to Manhattan that day for the purpose of selling UC-1 the methamphetamine that UC-1 wanted to distribute to the Manhattan Customers.  *See id.*  The defendant responded that he could not travel to Manhattan that day but could meet UC-1 somewhere between Manhattan and his location in Suffolk County to sell UC-1 the methamphetamine.  *See id.*  The defendant and UC-1 agreed to meet in or around Holtsville, New York, near the Long Island Expressway. Ultimately, the defendant and UC-1 met in or around Farmingville, New York, where the defendant sold UC-1 more than approximately 100 grams of methamphetamine.  *See* PSR ¶ 20. The foregoing transaction was the last of the approximately 15 methamphetamine transactions described above.

On or about December 3, 2020, in or around Suffolk County, law enforcement arrested an individual ("Individual-1") for possessing a quantity of suspected methamphetamine. *See id.* ¶ 21. During a subsequent, voluntary interview of Individual-1, Individual-1 stated to law enforcement that Individual-1 had purchased the methamphetamine from an individual whom Individual-1 knows as "J" or "John," and who was subsequently identified as the defendant. *See id.* Individual-1 further stated that Individual-1 had previously purchased methamphetamine from the defendant on numerous occasions in or around Suffolk County, and that on at least some of those occasions, Lipsky had been present. *See id.*

Individual-1 provided law enforcement with the phone number at which Individual-1 had contacted the defendant to purchase at least some of that methamphetamine, which ended in 4027 (the "4027 Phone Number"). *See id.* The 4027 Phone Number is one of the phone numbers that the defendant used in or about November 2020 to communicate with UC-1 regarding some of the methamphetamine transactions described above. On or about November 13, 2020, Magistrate Judge Debra Freeman signed a warrant for prospective location and pen register information for the cellphone assigned the 4027 Phone Number (the "4027 Cellphone"). *See id.* ¶ 22. Individual-1 also provided law enforcement with the phone number of Lipsky, which ended in 7010 (the "7010 Phone Number"). A search of law enforcement databases showed that the 7010 Phone Number was associated with Lipsky. On or about December 4, 2020, the defendant used the 7010 Phone Number to contact UC-1. *See id.* ¶ 23. The defendant and UC-1 discussed another potential methamphetamine transaction. *See id.*

On or about December 8, 2020, using prospective location information for the 4027 Cellphone, law enforcement determined that it was likely located at or around a particular hotel ("Hotel-1") in or around Bohemia, New York. *See id.* ¶ 24. Law enforcement began surveilling

Hotel-1 and observed two particular vehicles in or around the parking lot that law enforcement had previously observed the defendant driving to or from the methamphetamine transactions with UC-1 described above, including a particular motorcycle ("Motorcycle-1").  *See id.*

Later the same day, UC-1 called the 7010 Phone Number.  *See id.* ¶ 25.  Lipsky answered. The voice of the defendant could be heard in the background.  *See id.*  Lipsky told the defendant that UC-1 was on the phone.  *See id.*  Lipsky and the defendant then had a conversation that could be heard at least partially in the background.  *See id.*  Lipsky thereafter informed UC-1 that there was a delay, so Lipsky and the defendant would be unable to sell methamphetamine to UC-1 until the following day.  *See id.*  When pressed by UC-1, Lipsky stated that she and the defendant could potentially sell UC-1 approximately seven grams of methamphetamine.  *See id.*  Lipsky further stated that the defendant would be available to sell UC-1 the methamphetamine approximately a few hours later, near Islandia, New York.  *See id.*  The foregoing call was recorded.  *See id.*

Shortly thereafter, law enforcement observed the defendant leave Hotel-1, get on Motorcycle-1, and drive away.  *See id.* ¶ 26.  Law enforcement followed the defendant, stopped him, and arrested him.  *See id.*  Lipsky was subsequently arrested at or around Hotel-1.  *See id.*

**b. Post-Arrest Conduct**

On or about December 9, 2020, the day after the defendant's arrest, he was charged by sealed complaint in the Southern District of New York with a violation of 21 U.S.C. § 846 based on the conduct described above.  At the defendant's presentment, the Government and defense counsel proposed the standard bail conditions, as well as the following additional conditions, which Magistrate Judge Sarah Netburn ordered:

- $20,000 personal recognizance bond to be co-signed by one financially responsible person;

- Travel restricted to the Southern and Eastern Districts of New York;

- Surrender travel documents and no new applications;

- Pretrial supervision as directed by Pretrial Services;

- Drug testing and treatment as directed by Pretrial Services;

- Defendant not to possess a firearm, destructive device, or other weapon;

- Defendant not to use or unlawfully possess a narcotic drug or other controlled substance unless prescribed by a licensed medical practitioner;

- Defendant to be released on his own signature, with the remaining conditions to be met by December 18, 2020.



On or about March 1, 2021, Pretrial Services submitted a violation memorandum to Magistrate Judge Robert W. Lehrburger describing violations of the defendant's bail conditions that he had committed in or about January 2021. As detailed in the report:

- On January 7, 2021, the defendant was referred to Community Counseling Services of Ronkonkoma ("CCS") for outpatient drug treatment. The defendant made his initial contact with the program on January 15, 2021. He was required to attend weekly individual sessions and twice weekly virtual group sessions but failed to attend his treatment as scheduled. Specifically, on January 28, 2021, the defendant failed to attend his virtual session with CCS. On February 4, 2021, the defendant failed to report to CCS for a supervised urinalysis and his virtual group sessions. Furthermore, the defendant failed to report to Pretrial Services on several occasions. Specifically, the defendant failed to report on January 6, 2021, February 3, 2021, and February 10, 2021. The defendant last reported for his virtual individual session on February 18, 2021, and failed to report for his two virtual group sessions that same week.

- Additionally, the defendant's supervising Pretrial Services Officer reported that, on January 15, 2021, the defendant tested positive for methamphetamine. The Officer advised that the defendant's failure to answer calls or attend scheduled appointments has made it impossible to conduct more frequent drug testing.

Given the foregoing violations ████████████████████████████████, the parties agreed that he was not amenable to Pretrial Services supervision at that time.  In or about March 2021, Pretrial Services submitted to Judge Lehrburger a proposed order terminating the defendant's Pretrial Services supervision ████████████████████████  The proposed order stated that ████████████████████ the parties may petition the court to reinstate Pretrial Services Supervision."  Judge Lehrburger subsequently signed the order.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

On or about July 13, 2021, ████████████████████████████ ████████ the Government submitted a letter to Magistrate Judge Gabriel W. Gorenstein on behalf of itself, Pretrial Services, and defense counsel, in which the parties requested that Judge Gorenstein modify the defendant's bail conditions by re-imposing the standard conditions as well as the following additional conditions:

- Home detention enforced by location monitoring as directed by Pretrial Services;

- Defendant to report to Pretrial Services at the Alfonse D'Amato United States Courthouse, United States District Court for the Eastern District of New York, 100 Federal Plaza, Central Islip, New York 11722, on or before July 16, 2021, for installation of a location-monitoring device;

- No visitors to defendant's residence in Rocky Point, New York ("Residence-1") without prior approval of Pretrial Services;

- No new travel document applications;

- Pretrial supervision as directed by Pretrial Services;

- Drug testing and treatment as directed by Pretrial Services;

- Defendant not to possess a firearm, destructive device, or other weapon;

- Defendant not to use or unlawfully possess a narcotic drug or other controlled substance unless prescribed by a licensed medical practitioner.

On or about July 13, 2021, Judge Gorenstein granted the parties' request and imposed the foregoing conditions.

On or about August 6, 2021, Pretrial Services submitted a second violation memorandum describing the approximately seven violations of the defendant's bail conditions that the defendant had committed since Judge Gorenstein reimposed them, starting on or about July 15, 2021, just two days after the conditions were reimposed. As detailed in the report:

- On July 15, 2021, the defendant was tested and the results were positive for amphetamines, methamphetamines, and marijuana.

- On July 21, 2021, the defendant was tested at CCS and the results were positive for methamphetamines and amphetamines. The defendant was also approximately 19 minutes late upon entering Residence-1 past his directed time.

- On July 28, 2021, and July 29, 2021, the defendant failed to attend two group substance abuse treatment sessions at CCS. He later stated that he lost track of time. The defendant was required to attend virtual group sessions twice per week and one in-person individual session once per week. On July 28, 2021, the defendant was over 30 minutes late returning home.

- On July 31, 2021, the defendant left Residence-1 without permission on two occasions. First, the defendant was outside Residence-1 without approval from 1:59 a.m. until 2:13 a.m. Later that same date, the defendant left Residence-1 at 1:17 p.m. after leaving a voice message noting he had an emergency. During the defendant's unauthorized leave, the supervising officer was unable to reach him. The defendant returned home at 3:12 p.m., but could not be reached until 3:45 p.m. He later explained that his friend's motorcycle broke down and he was there to assist him. The supervising Pretrial Services Officer admonished the defendant and reminded him about the rules of location monitoring.

- On August 1, 2021, the defendant was outside Residence-1 without permission from 3:13 p.m. until 3:53 p.m. and again from 4:12 p.m. until 4:23 p.m.

- On August 3, 2021, a Pretrial Services Officer directed the defendant to report for a urinalysis. The defendant reported as directed and submitted to a urinalysis, which was presumptively positive for amphetamines. After being questioned by the Officer about the status of his substance abuse, the defendant reported that he had used methamphetamine

"possibly last Friday" (*i.e.*, July 30, 2021), which he found at Residence-1.  He denied using marijuana since his previous urinalysis on July 15, 2021.  The Officer encouraged the defendant to utilize his treatment staff as much as possible to help him overcome his addiction.

Based on the foregoing violations, Magistrate Judge Sarah L. Cave scheduled a bail hearing for August 18, 2021.  At the bail hearing, Pretrial Services sought the defendant's remand.  Judge Cave continued the defendant's bail and did not modify his conditions.  Judge Cave, however, warned the defendant that any additional violations would result in his remand.  Judge Cave also scheduled weekly status conferences to review the defendant's compliance with his conditions.

On or about September 10, 2021, Judge Cave held a telephonic weekly status conference, at which Pretrial Services reported that the defendant had again tested positive for methamphetamine on September 2, 2021.  Judge Cave continued the defendant's bail and did not modify his conditions.

On or about September 29, 2021, the defendant appeared before the Court and pleaded guilty to a one-count superseding information charging him with narcotics trafficking conspiracy, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B), based on the methamphetamine trafficking conspiracy described above.  The defendant pleaded guilty pursuant to a plea agreement with the Government, in which the parties stipulated that his United States Sentencing Guidelines range was 70 to 87 months' imprisonment.

The defendant's conviction made his presentence remand mandatory unless he could show by clear and convincing evidence that he was not likely to flee or pose a danger to any other person or the community and he could also clearly show that there were exceptional reasons why detention would not be appropriate.  *See* 21 U.S.C. § 846, 841(b)(1)(B); 18 U.S.C. §§ 3143(a)(2), 3145(c).

At the defendant's change-of-plea hearing, the Government argued that remand was mandatory under 18 U.S.C. § 3143(a)(2) and that exceptional reasons did not exist.  Defense

counsel sought the defendant's continued bail, arguing that exceptional reasons existed. Defense

counsel argued that the "primary exceptional reason" was the defendant's ongoing drug treatment.

Sept. 29, 2021 H'r'g Tr. 35. Defense counsel further represented that the defendant had committed

to "going back to the way that he used to live, to leading a law abiding life." *Id.* at 36. Defense

counsel continued:

> [E]ven if the Court does impose a custodial sentence eventually, in order for Mr.
> Lewis to be in a position to really remain sober and to maintain his rehabilitation
> while incarcerated, I think this time leading up to a sentence is extremely valuable.
> He has said repeatedly to me, to Judge Cave, to his Pretrial Services Officer, that
> he really is committed to sobriety in a way that he was not in the past. And this
> moment I think is very important. . . . So I think that even if he were to go into
> custody, if he could go into custody sober as opposed to still using, that will have a
> significant impact on his rehabilitation, which, of course, is a 3553(a) factor.

*Id.* at 38.

The Court granted defense counsel's motion. In doing so, however, the Court cautioned

that the case was a "difficult" one, and suggested that the decision to grant the motion had been

close:

> Certainly the types of circumstances that are normally on a case-by-case evaluation,
> found to be exceptional, are not present here. On the other hand, we have a person
> who has clearly struggled with sobriety and is in a program of supervision,
> including an investment of significant time and effort by the Court and counsel to
> assist him in achieving and maintaining sobriety, and he is being compliant with
> that program, which would, if he continues to comply and obtains maximum benefit
> from it, put him in a better position to go into custody if, in fact, a custodial sentence
> is imposed.
>
> I also consider that we are in a time in the world in which the pandemic restricts
> the resources available in facilities of the [Bureau of Prisons (the "BOP")],
> particularly in detention facilities. And so, it is likely not only that there would be
> a break in the sort of intensive services that he is being provided, but there may be
> a break entirely in any sort of services or resources. And he is currently under—
> it's home incarceration; is that correct? . . . .
>
> So, under these specific circumstances, I find that for as long as Mr. Lewis
> continues to be compliant in all respects with his bail, including with the weekly
> check-in provisions, and he does not violate any provisions of the bail, that there

are extraordinary reasons within the meaning of Section 3145(c), why it would be inappropriate for him to commence his detention now.  However, if he is violated, then I believe those exceptional reasons would dissipate.

So, I am giving you, Mr. Lewis, an exceptional chance.  I'm not doing this [unintelligible in transcript], and I am not doing it in the belief that it's going to be easy for you to comply, but if you can, invest yourself completely in compliance and in getting the maximum benefit from the treatment and supervision that you are undergoing now, that is the best investment that you can make in your own life and I, as the judge, find that affording you that opportunity is an exceptional reason not to remand you in accordance with the normal statutory remand obligation. Therefore, the current conditions of bail, which include home incarceration, treatment, and weekly supervision are continued pending sentencing, but the Court is to be informed of any violation, and that will be reflected in the docket.

*Id.* at 39-41 (emphasis supplied).

On October 27, 2021, in advance of a previously scheduled telephonic status conference before Judge Cave, the Government filed a letter on the docket detailing numerous additional violations of supervised release that the defendant had committed, including that he had tested positive for methamphetamine two additional times; that he had allowed Lipsky to reside with him without seeking approval from or even informing Pretrial Services; and that he had continued to distribute narcotics.  *See* Dkt. No. 49.  Through the letter, the Government sought the defendant's remand.  *See id.*  At the conference before Judge Cave, following lengthy oral argument, Judge Cave granted the Government's request and ordered the defendant to surrender at 9:00 a.m. the following morning at the Eastern District of New York courthouse in Central Islip.  *See* Dkt. No. 50.  The defendant failed to surrender on time and had to be directed again to surrender by Pretrial Services.  The defendant eventually surrendered later that day.

The day after the defendant's surrender, law enforcement recovered the photographs that appear below from the pole camera that had been installed outside the defendant's residence to monitor his suspected continued narcotics distribution.  The photographs were taken on October 27, 2021, between at or around 4:30 p.m. and 5:00 p.m., after the Government had disclosed the

existence of the pole camera in its letter but immediately before the beginning of the telephonic status conference with Judge Cave that resulted in the defendant's remand.  The first photograph appears to show the defendant giving two middle fingers to the pole camera, and the second photograph appears to show the defendant interacting with two unidentified and unapproved visitors, in violation of the conditions of his supervised release:





## II.     Discussion

In this case, a sentence that is below the Guidelines range of 70 to 87 months'
imprisonment, but which is at least 48 months' imprisonment, would be sufficient, but not greater
than necessary, to reflect the seriousness of the offense; promote respect for the law; provide just
punishment for the offense; afford adequate deterrence to criminal conduct; and protect the public
from further crimes of the defendant, as required by 18 U.S.C. § 3553(a).

Of the relevant factors, it is the seriousness of the offense that looms largest.   This
country—including, increasingly, the New York City area—is suffering through an unprecedented
methamphetamine crisis.   *See* CENTERS FOR DISEASE CONTROL AND PREVENTION, PATTERNS AND
CHARACTERISTICS OF METHAMPHETAMINE USE AMONG ADULTS—UNITED STATES, 2015-2018,
https://www.cdc.gov/mmwr/volumes/69/wr/mm6912a1.htm ("Methamphetamine is a highly
addictive central nervous system stimulant.   In recent years, methamphetamine availability and
methamphetamine-related harms have been increasing in the United States."); *see also id.* (noting
"trends of increasing opioid-related overdose deaths and treatment admissions that involve
methamphetamine").   The drug "is a particularly addictive controlled substance and the
manufacture of methamphetamine is a particularly dangerous process."  *United States v. Santaw*,
No. 2:11-MJ-127, 2012 WL 12386, at *2 (D. Vt. Jan. 3, 2012).

The defendant distributed at least approximately 700 grams of this inherently dangerous
drug in this community—and that is not counting the many additional grams that the defendant
sold to individuals other than UC-1, such as Individual-1.  Seven hundred grams is well over the
threshold required to trigger the 10-year mandatory minimum sentence under 18 U.S.C.
§ 841(b)(1)(A).  The fact that the defendant was permitted to plead to a lesser-included offense, █
████████████████████████████████████████████████, and the fact that he appears to be

eligible for safety-valve relief, should not diminish the significance of the quantity and type of drugs he sold, which could have contributed to multiple overdose deaths if the buyer had not been working with law enforcement (unbeknownst to the defendant).

From the perspective of specific deterrence, it is also extremely concerning that the defendant abused the trust of ███████████ Pretrial Services, and the Court by continuing to distribute narcotics even after his arrest ████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████     ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████     ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████

But the defendant did not learn his lesson.  A relatively short time later, he was back to distributing methamphetamine ███████████████████████████████████████████████

██████████████████████████████████. Instead, the Government learned about his continued

distribution from a confidential source working with the Government. ███████████

███████████████████████████████████

███████████████████████████████████████████

███████   The Government will not recapitulate the details here, but the defendant was remanded after the Government put significant evidence of his ongoing violations of the conditions of his supervised release, including his continued narcotics distribution, before Judge Cave.

The Government is concerned that, unless the Court imposes a significant incarceratory sentence to deter the defendant from distributing methamphetamine in the future, he will return to the same course of conduct in which he has engaged so many times as soon as he is released.

The Government recognizes that defense counsel has identified several mitigating factors that militate against a Guidelines sentence, which would risk overstating the defendant's culpability.  But the sentence of time served that defense counsel proposes would have the opposite effect.  It would dramatically understate his culpability, the seriousness of the offense, and the necessity of specific deterrence in this case.

## **CONCLUSION**

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence that is below the Guidelines range of 70 to 87 months' imprisonment, but which is at least 48 months' imprisonment.

Dated: January 7, 2021
       New York, New York

                             Respectfully submitted,

                             DAMIAN WILLIAMS
                             United States Attorney for the
                             Southern District of New York

By:      _/s/_____
           Emily A. Johnson
           David J. Robles
           Benjamin Woodside Schrier
           Assistant United States Attorneys
           (212) 637-1062